1

2 BYRON Z. MOLDO (BAR NO. 109652)
PETER A. DAVIDSON (BAR NO. 76194)
3 ERVIN COHEN & JESSUP LLP
9401 Wilshire Boulevard, 9th Floor
Beverly Hills, CA 90212
4 Phone: (310) 273-6333
Fax: (310) 859-2325
5 E-Mail: bmoldo@ecjlaw.com
          pdavidson@ecjlaw.com
6

7 Attorneys for Stephen J. Donell,
Temporary Receiver
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

11

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. CV 10-1689-GW(AJWx) |
| Plaintiff, | FIRST INTERIM REPORT OF STEPHEN J. DONELL, TEMPORARY RECEIVER |
| v. | DATE: March 23, 2010 |
| FRANCOIS E. DURMAZ (aka MAHMUT E. DURMAZ), ROBERT C. PRIBILSKI, USA RETIREMENT MANAGEMENT SERVICES (aka USA FINANCIAL MANAGEMENT SERVICES, INC. | TIME: 9:00 A.M. CTRM: 10 |
| Defendants, | |
| And | |
| SIBEL INCE, MEHMET KARAKUS, MARLALI GAYRIMENKUL YATIRIMLARI, MARLALI PROPERTY INVESTMENT COMPANY, LLC, GULEN ENTERPRISES, INC., | |
| Relief Defendants. | |

1    Stephen J. Donell, Temporary Receiver ("Receiver") for defendant USA Retirement

2  Management Services (aka USA Financial Management Services, Inc.) ("USA") and all entities

3  controlled by defendants  Francois E. Durmaz ("Durmaz") and Robert C. Pribilski ("Pribilski"),

4  including Marlali Property Investment Company, LLC ("Marlali"), and their subsidiaries and

5  affiliates (collectively "Receivership Entities"), appointed pursuant to this Court's Temporary

6  Restraining Order and Orders: (1) Freezing Assets; (2) Appointing a Temporary Receiver;

7  (3) Prohibiting the Destruction of Documents; (4) Granting Expedited Discovery; (5) Repatriating

8  Funds; (6) Requiring Surrender of Passports; and (7) Requiring Accountings; and Order to Show

9  Cause re Preliminary Injunction and Appointment of a Permanent Receiver ("Appointment

10  Order"), entered on March 9, 2010, herewith submits this First Interim Report of Receiver

11  ("Report").

12    Pursuant to the Appointment Order and law governing federal equity receivers, the

13  Receiver has been charged with, among other things, assuming control over the Receivership

14  Entities and their assets ("Receivership Assets"); performing an accounting of the assets and

15  financial condition of the Receivership Entities; investigating, locating, and recovering

16  Receivership Assets; preparing reports for the Court; and preparing an appropriate claim

17  allowance and investor/creditor distribution plan.  Although the Receiver has successfully

18  obtained some documents and records from the sources identified below, his document analysis

19  and recovery efforts remain incomplete.  As described more thoroughly in this Report and in the

20  Project Status Update prepared by Crowe Horwath LLP, the Receiver's forensic accountants, the

21  documents and records obtained to date provide only a partial explanation of the past and present

22  financial condition of the Receivership Entities, including the financial transactions and business

23  in which they engaged.

24    Due to the volume and nature of the information acquired to date, the shortness of time

25  since the Receiver's appointment between the receipt of information and this Report, the

26  complexity of the matters analyzed by the Receiver and his professionals, and the need for

27  significant additional information, this Report is preliminary.  The Receiver may need to

28  materially modify its contents after further investigation and consideration.  As discussed below,

1

1  although the Receiver and his professionals have made significant progress in their investigation

2  and recovery efforts, a great deal of work remains to be done.

3  **I.      PROCEDURAL BACKGROUND.**

4          On March 9, 2010, the United States Securities and Exchange Commission (the

5  "Commission") filed its Complaint For Violation of Federal Securities Laws ("SEC Complaint")

6  against Defendants Durmaz, Pribilski, and USA, and various Relief Defendants, accompanied by

7  an *Ex Parte* Application of Plaintiff Securities and Exchange Commission for Temporary

8  Restraining Order: Orders:  1) Freezing Assets; 2) Appointing a Temporary Receiver; 3)

9  Prohibiting the Destruction of Documents; 4) Granting Expedited Discovery; 5) Repatriating

10  Funds; 6) Requiring Surrender of Passports; and 7) Requiring Accountings; and Order to Show

11  Cause re Preliminary Injunction and Appointment of a Permanent Receiver.  On March 9, 2010,

12  this Court issued a Temporary Restraining Order freezing assets and prohibiting the destruction of

13  documents by the Defendants and Relief Defendants, and issued an Order to Show Cause set for

14  March 23, 2010.  The Court entered the Appointment Order on March 9, 2010.

15          On March 16, 2010, Mark Hathaway entered his appearance in this matter as counsel for

16  defendant Pribilski.  The Receiver is unaware of any other appearances and the Receiver has not

17  received any opposition to his appointment as Permanent Receiver pursuant to the order to show

18  cause.

19  **II.     SUMMARY OF RECEIVER'S ACTIVITIES AND EFFORTS.**

20          A.      Assertion of Jurisdiction.

21          The territorial jurisdiction of this Court – and thus of the Receiver – is extended to any

22  district of the United States where Receivership Assets are believed to be located.  28 U.S.C.

23  § 754; see also Haile v. Henderson Nat'l Bank, 657 F.2d 816, 822 (6th Cir. 1981).  Based on

24  information obtained by the Receiver to date, the Receiver has filed the SEC Complaint and

25  registered the SEC Complaint and Appointment Order in the United States District Court in

26  Illinois, in conformity with 28 U.S.C. § 754 and applicable federal law.  As additional information

27  becomes available, the Receiver may file/register the SEC Complaint and Appointment Order in

28  other districts.

IDOCS:13326.7:1024437.1702024.01/SD

B.      Employment Of Professionals.

Section VIII(C) of the Appointment Order vests the Receiver with the authority to employ professionals to assist in his efforts.  To date, the Receiver has engaged (i) the law firm of Ervin Cohen & Jessup, LLP ("ECJ") to serve as Receiver's counsel and assist in the performance of his duties; (ii) the accounting firm of Crowe Horwath LLP ("Crowe"), to serve as the Receiver's principal forensic and tax accountant; and (iii) the firm of Document Technologies, Inc. to assist with computer forensics and imaging.  The Receiver anticipates that it may be necessary to utilize the services of a private investigator in order to assist with further discovery and recovery of Receivership Assets.

C.      Document Recovery.

As of the date of the Appointment Order, the Receivership Entities operated offices in Oakbrook Terrace, Illinois, Los Angeles, California, and Irvine, California.  The Receiver believes that most of the business documents and financial records relating to the Receivership Entities were located in the Illinois office.  The Receiver is in the process of having a large number of documents scanned in the Illinois office, as he has been served with a document subpoena by government agencies and it is necessary to create the proper chain of custody for all such documents as well as having access to numerous copies for him and his professionals, as well as to comply with the subpoena.  It is estimated that it will cost in excess of $50,000 to image documents and hard drives in the Chicago office.  Thereafter, the Receiver's administrator will begin transporting the business documents and financial records in the Illinois office to the Receiver's office in Los Angeles, California.  The Receiver believes that the Los Angeles office was primarily used to arrange seminars for prospective clients, prepare and maintain estate planning documents, and the Irvine office was primarily used for the same purpose.  As a consequence, the Receiver has been required to obtain documents and records from three offices, and other sources, including, but not limited to the following:

1.      Documents Obtained From the Commission.

On behalf of the Receiver, ECJ requested access to any Receivership Entity documents and records possessed by the Commission.  The Receiver's request was subsequently granted, and the

3

1    Commission produced copies of Receivership Entity documents to the Receiver shortly thereafter.

2    The Commission's production was extensive, and included partial bank and brokerage statements

3    and related documents.

4                    2.      Documents Requested from Accountants for Receivership Entities.

5          The Receiver learned that the firm of Mueller & Company, LLP ("Mueller') located in

6    Elgin, Illinois, served as accountants to the Receivership Entities prior to the Receiver's

7    appointment.  The Receiver requested that Mueller deliver all books and records of the

8    Receivership Entities in their possession.  As of the preparation of this Report Mueller has not yet

9    delivered any documents to the Receiver, but based on discussions to date, the Receiver expects

10   that Mueller will fully and completely comply with the Receiver's request.

11                   3.      Documents Requested from Sichenzia Ross Friedman Ference LLP

12                           ("Sichenzia").

13         The Receiver located documents in the Illinois and California offices of the Receivership

14   Entities that referred to Cruzar Fund Management Services, LLC ("Cruzar").  The Receiver

15   believes that Cruzar is either a subsidiary or affiliate of the Receivership Entities and had recently

16   been formed to serve and a potential investment vehicle for individuals.  The Receiver also located

17   information that  the Sichenzia law firm, located in New York, New York, was counsel for Cruzar.

18   On March 12, 2010, ECJ on the Receiver's behalf prepared and sent a letter to the Managing

19   Partner of Sichenzia in which he demanded that Sichenzia immediately deliver all documents of

20   Cruzar in their possession to the Receiver.  As of the preparation of this Report Sichenzia has not

21   responded to ECJ's March 12, 2010 correspondence.

22                   4.      Receivership Entity Mail Recovery.

23         Immediately upon his appointment, the Receiver contacted the United States Postal

24   Service to request that all mail addressed to the Receivership Entities be forwarded to him.  The

25   Postal Service has complied with his request, and is now forwarding Receivership Entity mail

26   directly to the Receiver.

27

28

4

III.   **INVENTORY OF RECEIVERSHIP ASSETS.**

    A.   **Frozen Bank Accounts.**

    The Appointment Order froze the following accounts believed to contain Receivership Assets:

| Institution | Account holder | Account # (last 4 digits) |
|---|---|---|
| JP Morgan Chase (WaMu) | Marlali Property Investment Co., LLC | 0232 |
| JP Morgan Chase | USA Financial Management Services | 0342 |
| Harris N.A. | Marlali Property Investment Co., LLC | 9029 |
| Harris N.A. | Marlali Property Investment Co., LLC | 9037 |
| Harris N.A. | Marlali Property Investment Co., LLC | 9053 |
| Harris N.A. | Marlali Property Investment Co., LLC | 6582 |
| Harris N.A. | USA Retirement Management Services | 1048 |
| Harris N.A. | USA Financial Management Services Inc. | 0247 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

    The Receiver provided each of the above financial institutions with a copy of the Appointment Order, followed by a request that the financial institutions turn over to the Receiver any and all funds held in the name of (or controlled by) the Receivership Entities.  In response, Harris N.A. turned over a total of $111,727.96 to the Receiver.  In addition, the Receiver discovered an entity by the name of Bridge Forum, LLC ("Bridge") that appeared to be a subsidiary or affiliate of the Receivership Entities.  The Receiver located a bank account of Bridge at HSBC Bank, and immediately provided HSBC Bank with a copy of the Appointment Order and

1   a written request that all funds in accounts of Bridge and the Receivership Entities be delivered to

2   the Receiver.  The Receiver was subsequently informed that the Bridge account at HSBC Bank

3   contained less than $ 500.00.

4        Nonetheless, the Receiver expects that it may be necessary to serve financial institutions

5   with subpoenas for the production of bank statements, cancelled checks and other documents in

6   order to assist in reconstructing the Receivership Entities' history and financial activities.

7        **B.     Assets of the Individual Defendants.**

8        The Defendants and Relief Defendants were required by the terms of the Appointment

9   Order to file detailed and complete schedules of their assets, including all real and personal

10  property exceeding $5,000 in value, and all bank, securities, futures, and other accounts, identified

11  by institution, branch address, and account number.  The accountings were to include a description

12  of the source(s) of all such assets.  As of this date, only defendant Pribilski has provided such  an

13  accounting to the Receiver.

14  **IV.   FINANCES AND BUSINESS OPERATIONS OF THE RECEIVERSHIP ENTITIES.**

15       The Receiver's forensic accountants, Crowe, has performed an initial analysis of the

16  Receivership Entities documents and records obtained to date, and has prepared an Initial Forensic

17  Accountant's Report outlining their tentative conclusions regarding the financial condition and

18  business of the Receivership Entities.  A copy of the Crowe initial report, without exhibits, is

19  attached hereto, marked Exhibit "A" and incorporated herein by reference.

20       **A.     Receivership Entity Business.**

21       The SEC Complaint alleges that the Receivership Entities solicited investors to invest their

22  individual retirement accounts in Turkish Eurobonds.  The Receiver has not located any evidence

23  that any Turkish Eurobonds were purchased with investor funds.  The Receiver has recovered

24  some computerized presentations likely used in connection with the solicitation of investments in

25  the Receivership Entities.  As noted throughout this Report, the Receiver's document recovery

26  efforts are incomplete and ongoing.

27       On March 10, 2010 at approximately 3:00 pm, the Receiver arrived at the Illinois offices of

28  the Receivership Entities.  The Receiver initially met with the building manager, arranged for

6

1  security and had security and building maintenance deactivate the electronic key card reader.

2  Additionally, the Receiver met with all employees, served each employee with a copy of the

3  Appointment Order, secured the office and made sure that all contents within the office remained

4  undisturbed. The Receiver explained his role as receiver to the employees and the allegations

5  contained in the documents filed with the Court by the SEC. In particular, the Receiver reiterated

6  that none of the allegations had been proven and the Receiver was neutral. Pribilski made very few

7  comments, and most employees seemed very surprised by all of the events. Some of the

8  employees stated that they suspected something was wrong and they were not surprised by the

9  SEC allegations. The Receiver obtained written job descriptions and phone numbers of all

10  employees present. Lastly, the Receiver began to review the books and records in the Illinois

11  office, and he focused on Pribilski's office. The Receiver also worked closely with Crowe

12  Horwath, his forensic CPA firm to begin the process of reviewing records to search for evidence

13  of funds available to remit returns to investors. Other than receipts from investors, the Receiver

14  did not locate any source of revenue to provide returns to investors. The Receiver will return

15  possession of the offices to the landlord, in order to reduce any administrative claims to the

16  receivership estate and it will be necessary to seek court approval to sell a vehicle, furniture and

17  other personal property. Finally, once all computer hard drives are imaged and forensic copies are

18  provided to government authorities, the imaged drives will be reviewed by the Receiver and his

19  staff. There are approximately 50 hard drives to review.

20        Also on March 10, 2009, the Temporary Receiver assumed possession and control of the

21  premises located at 2121 Avenue of the Stars, Suite 2970, Los Angeles, California 90067 ("Los

22  Angeles Office") through his receivership administrator and counsel Byron Z. Moldo ("Moldo")

23  of Ervin Cohen & Jessup LLP ("ECJ"). At the time of their entry to the Los Angeles Office the

24  Temporary Receiver's administrator and Moldo discovered an office with seven (7) employees.

25  None of the individual defendants were present at the Los Angeles Office at the time the

26  Temporary Receiver assumed possession and control. On behalf of the Temporary Receiver

27  Moldo informed the employees in the Los Angeles Office of the appointment of the Temporary

28  Receiver, served each individual with a copy of the Court's March 9, 2010 temporary restraining

7

--

1    order, obtained contact information, and requested that each employee immediately leave the Los

2    Angeles Office.  While the employees were still present at the Los Angeles Office and gathering

3    their personal belongings Moldo and the Temporary Receiver's administrator inspected the Los

4    Angeles Office and discovered files containing estate planning documents of clients of defendants,

5    but no financial documents were located.  Discussions with employees of defendants indicated

6    that the primary business location of defendants was in Illinois, and that the Los Angeles Office

7    was primarily used to arrange and conduct seminars for prospective clients.  The Temporary

8    Receiver through his agents arranged for all appointments with clients for the coming week to be

9    cancelled.

10          At the time possession and control of the Los Angeles Office was acquired Moldo met

11    with Mary Der-Parseghian ("Der-Parseghian"), who identified herself as a consulting attorney for

12    defendants.  Later, and after having reviewed documents in the Los Angeles Office, Moldo located

13    a document signed by Der-Parseghian as an employee of defendants.  On March 11, 2010 Moldo

14    again met with Der-Parseghian at the Los Angeles Office and explained that he located a

15    document that she signed as an employee of defendant.  Moldo further stated that based on

16    instructions from the Temporary Receiver she would be required to vacate the Los Angeles Office.

17    Der-Parseghian stated that, in addition to her work for the defendants, she maintained clients and

18    files that had no connection or relationship to defendants.  Moldo instructed Der-Parseghian to

19    segregate any files or documents that she contended had no relationship to this matter, and Moldo

20    or a representative of the Temporary Receiver would review those files and documents before

21    Der-Parseghian could remove them from the Los Angeles Office.  On March 11, 2010, Peter

22    Davidson ("Davidson") of ECJ reviewed the files and documents segregated by Der-Parseghian

23    and allowed her to remove certain documents and files that had no relationship to this matter.

24          Moldo, Davidson, and the Receiver's administrator reviewed the files, offices, and other

25    documents in the Los Angeles Office.  Many of the documents therein referred to or made

26    reference to Cruzar Funds, an entity which appeared to be recently formed by defendants and

27    intended to be an investment vehicle for individuals or entities.  Moldo and Davidson also

28    discovered that a deposit of approximately $ 75,000 was paid to Swisshotels by the entity Bridge

1  Forum LLC ("Bridge") for a conference intended to be conducted in Instanbul, Turkey in

2  September, 2010.  The Receiver located a document that Bridge maintained a bank account at

3  HSBC Bank ("HSBC").  The Temporary Receiver, through ECJ, notified HSBC, in writing, of his

4  appointment and provided HSBC with a copy of this Court's March 9, 2010 temporary restraining

5  order, and instructed HSBC to immediately "freeze" any accounts of the defendants, and Bridge,

6  and to forward the balance of funds to the Temporary Receiver.  During a March 16, 2010

7  telephone conversation with an HSBC representative Moldo was informed that less than $ 500.00

8  remained in the Bridge account.

9          While reviewing the books and records at the Los Angeles Office Moldo and Davidson

10  discovered documents indicating that Marlali Property Investment Company, LLC ("Marlali")

11  owned or possessed interests in several operating restaurants that conducted business under the

12  names of Gulen's Mediterranean ("Gulen's") and Anthony's NY Deli ("Anthony's").  Based on

13  discussions with Der-Parseghian, Moldo and Davidson were informed that Marlali owned

14  restaurants located in the Century City Mall and Topanga Mall.  On March 11, 2010 Moldo and

15  Davidson visited the Century City Mall and found that Gulen's was no longer operating.  The

16  Temporary Receiver has subsequently discovered that Anthony's is no longer operating in the

17  Topanga Mall, and Marlali recently entered into a management agreement with a third party to

18  operate Gulen's in the Topanga Mall.  The Temporary Receiver has received and reviewed

19  correspondence including a three-day notice to pay rent or quit from Westfield, the owner of both

20  the Century City and Topanga Malls, claiming that Marlali failed to pay the required rent.  The

21  Temporary Receiver has not yet reviewed the leases or rental agreements that Marlali previously

22  executed with Westfield for the Gulen's and Anthony's restaurants.  Further, the Temporary

23  Receiver has not had sufficient time to review the Marlali books and records to determine whether

24  or not the Gulen's or Anthony's restaurants are profitable or not.   The Temporary Receiver

25  through ECJ has notified Westfield of his appointment and provided Westfield with a copy of the

26  Court's March 9, 2010 temporary restraining order.

27          While Davidson was supervising Der-Parseghian's removal of her third party client files

28  from the offices, Davidson inquired as to any pending litigation the parties in receivership were

9

1 involved in.  Der-Parseghian indicated that USA was not involved in any pending litigation but it

2 recently settled two actions.  One with the Kralls, which was settled by a lump sum payment in

3 November, 2009 of $591,202, and one with the Orhans.  Some documents relating to the litigation

4 are in the Los Angeles Office but have not yet been reviewed.  Der-Parseghian indicated that one

5 of the matters settled for the return to plaintiffs of their money.  In the other matter Der-Parseghian

6 believed that the plaintiffs received more than they invested.  Although there is no pending

7 litigation with regard to USA Der-Parseghian indicated there was litigation pending with regard to

8 Marlali as a result of its attempts to open restaurants in Washington and in Roseville, California.

9 She indicated with regard to the Roseville restaurants, which included an Anthony's and a Sultan's

10 restaurant, the construction of the restaurants was completed and the restaurants opened for

11 approximately a month but were then closed when it was determined they could not be operated

12 profitably given the traffic in the malls.  With regard to the restaurants to be opened in the Everett

13 mall in Washington and the Sunrise mall in Washington, construction was never completed and

14 there are substantial sums owed to the contractors and there will also be liability on the leases.

15
16     **B.    Document Review and Analysis.**

17         The Receiver and his professionals have started to  organize, review, and correlate

18 documents and records in order to better understand and document:  (1) the structure the

19 Receivership Entities and the inflows and outflows of funds within and between the Receivership

20 Entities; (2) the business, if any, conducted by the Receivership Entities; (3) those persons or

21 entities who may be in possession of Receivership Entity documents, records, or assets; and (4)

22 any gaps in the record and additional recommended analytical steps.

23         The Receiver has recovered some monthly bank and brokerage statements (including

24 duplicates) for the Receivership Entities.  These statements provided inadequate details regarding

25 transactions identified (e.g., only a portion of the actual deposit slips, checks, wire transfer

26 documents, cashier's checks, etc. underlying the subject transfers have been recovered.)  As a

27 result, the conclusions expressed in the Initial Forensic Accountant's Report are preliminary and

28 may change based upon the recovery of additional information.

IDOCS:13326.7:1024437.1702024.01/SD

1    Potentially as a result of the generalized control of the Receivership Entities, and as

2  preliminarily determined by Crowe, it appears that there was significant commingling of assets

3  among the Receivership Entities, and that a complete accounting of investor funds or Receivership

4  Entities assets will be time-consuming and laborious.

5    The financial documents reviewed by Crowe do provide some insight into the financial

6  activity of the Receivership Entities, and seem to indicate that millions of dollars were transferred

7  to Marlali and Turkey from the Receivership Entities.

8    **C.    Initial Impressions of the Business of the Receivership Entities.**

9    The documents obtained to date create the impression that:

10   - The Receivership Entities did not possess assets from which income could be

11     derived to pay their investors;

12   - Distributions to investors may have been made from funds recovered by later

13     investors;

14   - There was significant commingling of assets among the Receivership Entities; and

15   - Significant funds were utilized by the Receivership Entities to engage in the

16     initiation and operation of several restaurants, none of which appear at this time to

17     be profitable; and

18   Because the Receiver's investigation and document recovery efforts are ongoing, the

19  conclusions presented are tentative, and may require modification after further investigation and

20  consideration.

21  **V.    CREDITORS AND CLAIM AMOUNTS.**

22   At this state of his investigation, the Receiver is unable to identify all investors and

23  creditors of the Receivership Entities or to determine their alleged respective claims.  Specifically,

24  a reliable investor database has not yet been discovered, analyzed, or created.  As a result, the

25  Receiver defers to a subsequent report any discussion of creditors, claim amounts, and a claims

26  process or plan for distribution.  The Receiver maintains his website, www.fedreceiver.com, in

27  order to enable investors and/or creditors to register with the site, thereby providing an additional

28  source of information to develop an investor/creditor list.

## VI.    RECOMMENDED FURTHER INVESTIGATION AND ACTIVITIES.

The Receiver's efforts to recover relevant Receivership Entity documents and records are ongoing, and the materials obtained to date do not provide a complete understanding of the Receivership Entities' history and financial activities, or the location and amounts of remaining Receivership Assets.  In part, the Receiver's document recovery efforts have been hampered by Mueller not yet delivering books and records of the Receivership Entities, and the defendants failure to provide the Court with an accounting of their assets, as required by the Appointment Order.

In the near term, the Receiver and his professionals will make recommendations in connection with their efforts to better understand and document the financial condition and activities of the Receivership Entities:

A.    <u>Continue Document Recovery Efforts.</u>

The Receiver's document recovery efforts are incomplete.  Crowe is continuing to review and examine the financial information contained on the computers located at the various business locations maintained by the Receivership Entities Document Technologies, Inc. continues to scan documents and computer hard drives in the Illinois office; that process is expected to be complete by March 25, 2010.

The Receiver intends, if necessary, to serve document subpoenas upon additional third parties believed to be in possession of Receivership Entities documents or assets.  Further, the Receiver reserves the right to depose any individual or entity believed to possess information relevant to his charge, as defined by the Appointment Order.

B.    <u>Continue Receivership Asset Recovery Efforts.</u>

As additional documentary evidence is acquired, it may be possible to better identify the location of outstanding or currently unaccounted for Receivership Assets.  Once located, the Receiver will proceed with recovery efforts, including the initiation of claims against third parties in possession of Receivership Assets.

C.     Maintain and Expand Lists of Individuals and Entities of Interest.

Investors in the Receivership Entities have provided the Receiver with unsolicited information regarding additional business ventures allegedly overseen or managed by the defendants or other affiliated individuals or entities.  A complete and evolving database relating to these individuals and entities could prove an invaluable tool in uncovering and accounting for additional Receivership Assets.

**VII.    CONCLUSION.**

Based on the Receiver's preliminary investigation and findings as described above, the Receiver recommends and requests that the Court order that the receivership continue pursuant to the Appointment Order and any supplemental orders issued by the Court.  The Receiver requests that the Court approve his continuing investigation and this Interim Report.

Dated:  March 22, 2010

By: _____

PETER A. DAVIDSON
ERVIN COHEN & JESSUP LLP
Attorneys for Stephen J. Donell,
Temporary Receiver

13

## <u>VERIFICATION</u>

I have read the foregoing FIRST INTERIM REPORT OF TEMPORARY RECEIVER, STEPHEN J. DONELL, and know its contents.

I am the Temporary Receiver appointed in this action.  The matters stated in the foregoing document are true of my own knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 22, 2010, at Los Angeles, California.

_____
Stephen J. Donell

IDOCS:13326.7:1024437.1702024.01/SD

Case No.  3:08cv-0764 BEN (NLS)

14

# EXHIBIT A

 Crowe Horwath™

Date: March 17, 2010

To:  Stephen J. Donell, Receiver for USARMS

From:  Howard Grobstein, Crowe Horwath LLP

Subject:  Project Status Update – SEC v. USARMS, Francois Durmaz, et al.

---

The purpose of this memo is to provide the Receiver a summary of our preliminary findings from our examination of the records at the Oak Brook Terrace, Illinois, Los Angeles and Irvine, California locations of USA Retirement Management Services ("USARMS") and Marlali Property Investment Company LLC ("Marlali") from March 12, 2010 through March 16, 2010.

## BACKGROUND

We were provided access to documents maintained at USARMS/Marlali's Oak Brook Terrace office during the period March 12, 2010 through March 16, 2010, USARMS/Marlali's Los Angeles office on March 15, 2010, and USARMS/Marlarli's Irvine office on March 16, 2010.  Our preliminary findings are based on a review of these documents, primarily those located in the office of Robert Pribilski, Managing Partner of USARMS and President of Marlali at the Oak Brook Terrace location.  We have not yet been provided with electronic general ledger files, a complete set of bank statements for all USARMS and Marlali accounts, or copies of checks and wires to identify the sources of all deposits and withdrawals.  As a result, our findings described below are limited to the source documents available to us at USARMS and Marlali's Oak Brook Terrace location and subject to change after we examine bank provided records and electronic general ledger files.

USARMS, formerly known as USA Financial Management Services Inc., has been incorporated since July 2003 and maintained offices in Oak Brook Terrace, Illinois, Irvine and Los Angeles, California.  Prior to 2005, the principals, Mahmut "Francois" Durmaz and Robert Pribilski, appear to have focused the business on selling insurance policies per documents and manuals found at the Oak Brook Terrace office[1].  Sometime in 2004, USARMS began receiving funds from clients to invest.  The earliest copy of an investment check we located is September 13,

---

[1] Documents were found listing Francois and Robert as sales agents of American Republic Insurance Company.

{HBG0054.DOCX / 1}

Attorney Work Product
Privileged and Confidential
Preliminary Draft

2004 (see Exhibit 1).   The $25,000 check agrees to a handwritten schedule of client investments we located in Robert Pribilski's office (see Exhibit 2).

In addition to the receipt of funds directly from clients, USARMS began receiving funds from Entrust IRA Services Inc. ("Entrust"), by directing their clients to invest their Individual Retirement Accounts ("IRA"s) with Entrust and then transferring the funds from Entrust to USARMS for investment.   Per the investor declarations in the Security and Exchange Commission ("SEC") complaint, USARMS told investors their money would be invested in Turkish Eurobonds.   When the client's funds was transferred either directly to USARMS or through the Entrust IRA transfers, promissory notes were executed from USARMS to the client directly (see Exhibit 3) or from USARMS to Entrust, for the benefit of the client (see Exhibit 4).

Marlali began operations in February 2006 per a description of the Company we noted in the Marlali December 31, 2007 unaudited financial statements[2] (see Exhibit 5).   Robert Pribilski is noted as the president of Marlali, Francois Durmaz as the Chief Executive Officer, and Umit "Jeff" Pecen as the Chief Financial Officer.   Marlali is referred to as an "affiliated company of USA Financial Management Services, Inc. (d/b/a USA Retirement)."   The December 31, 2007 financial statements also note that the company has a subsidiary Turkish company, Marlali Gayrimenkul Yatirimlari A.S., which is 100% owned by Malari.   Further, the financial statements state that:

> "Marlali (USA and Turkey) is primarily involved in real estate development and other diversified businesses.   One of the reasons we established Marlali (USA) was to make interim capital transfers to our Turkish company comply with Turkish banking and property ownership laws… Total investment is now a little bit over $12.5 million Dollars for Turkey subsidiary company.   The major project will have about 514 luxury condos-apartment complex with a shopping center in Adana region, Turkey.   Its projected investment is about 40 to 45 million US dollars in the next 4 years."[sic]

We also noted that the Marlali December 31, 2007 balance sheet "budget overview"[3] reports "Buildings to Rent" in the amount of $36.4 million and a liability "Due to USA Financial" of approximately $40 million.   We are unable to corroborate the purported transfers from USA to

---

[2] An audit report is included listing the CFO as the auditor.   This would not be appropriate under United States Generally Accepted Auditing Standards.   Additionally, the audit report states a different entity's name, not Marlali.
[3] We were not able to determine whether the amounts on the Marlali balance sheet or profit and loss statement were actual amounts or budgeted amounts.

Marlali that would have resulted in the $40 million "Due to USA" at December 31, 2007 as banking records for Marlali prior to 2008 were not located in the records at USARMS/Marlali locations.

## PRELIMINARY FINDINGS

### 1. Overview of USARMS – Sources and Uses

The table below summarizes our preliminary findings of sources and uses for USARMS' account #1610010247 located at Harris Bank from June 1, 2008 through February 28, 2010, the statements found at USARMS' Oak Brook Terrace location.

**USA Financial Management Services - Harris Account #0247**
**June 1, 2008 to February 28, 2010**

**Sources of Funds: (See Exhibit A for details)**

| | | |
|---|---:|---:|
| Wires from Entrust IRA Services | $  9,905,880 | 50.8% |
| Deposits from Non-IRA Clients | 2,466,080 | 12.7% |
| Other Sources | 175,000 | 0.9% |
| Transfers from Marlali | 85,000 | 0.4% |
| Unidentified Sources of Funds | 6,856,699 | 35.2% |
| | 19,488,659 | 100.0% |

**Uses of Funds: (See Exhibit B for details)**

| | | |
|---|---:|---:|
| Transfers to Marlali Property Investment Co. LLC | 4,653,709 | 23.5% |
| Transfers / Checks to Entrust IRA Services | 3,225,393 | 16.3% |
| Transfers / Checks to Clients - Principal Repayments | 2,286,969 | 11.5% |
| Other Uses of Funds (includes Checks to "Cash") | 1,427,681 | 7.2% |
| Transfers / Checks to "Francois" Mahmut Durmaz | 1,146,029 | 5.8% |
| Transfers / Checks to USARMS's Chase Account #0342 | 120,000 | 0.6% |
| Transfers Giray I. Durmaz | 81,000 | 0.4% |
| Unidentified Uses of Funds | 6,868,460 | 34.7% |
| | 19,809,240 | 100.0% |

| | | |
|---|---:|---|
| Sources less Uses | $  (320,581) | |

In the above table, we summarized the total sources of funds (i.e. clients' contributions from IRAs at Entrust, client transfer of funds directly to USARMS, transfers from Marlali and other) and total uses of funds (i.e. transfers to Marlali, disbursements of interest and/or principal made to Entrust IRA Services on behalf of various clients, disbursements of principal and interest made directly to clients, disbursements made to Mahmut "Francois" Durmaz, to USARMS

Attorney Work Product
Privileged and Confidential
Preliminary Draft

Chase's account, and others). (see Exhibits A and B for additional detail)  The total sources are approximately $19.5 million and total uses are approximately $19.8 million during the period June 2008 to February 2010.  At the end of February 2010, the USARMS' Harris Bank account had a balance of $182,778.

## Sources

### Entrust/IRA Transfers

We identified a total of $9.9 million, or 50.8% of the total source of funds, were incoming wires from Entrust, the entity to which certain USARMS clients transferred their IRAs.  We traced each incoming deposit to wire confirmations. We noted that "for the benefit" (FOB) with the name of the investor was included on each wire confirmation and a reference to "Note Purchase" was written on the majority of these wire confirmations.  From a review of a sample of client files found at USARMS' Oak Brook Terrace office, we noted that promissory notes were written from USARMS to Entrust, "FBO "client name") when the funds transfer involved an individual client's IRA account.  (see Exhibit 4).

### Direct Client Transfers

We identified deposits from non-IRA (non-Entrust) clients totaling $2.5 million, or 12.7% of the total source of funds.

The majority of these deposits were comprised of contributions from two clients:

- George & Katherina Papadopoulos transfer to USARMS of $1.2 million on November 17, 2009.  We noted a signed Promissory Note dated November 10, 2009 bearing interest at 8.35% per annum in their file.
- Miguel Sotomayor and Maria AB Living Trust transfer to USARMS of $700,000 on December 18, 2009.  We noted a signed Promissory Note dated December 18, 2009 bearing interest at 4.75% per annum in their file.

We also located a list of handwritten investment deposit listing for the period 2004 through 2007 with corresponding copies of deposit slips and checks that had been deposited in Robert Pribilski's office. (see Exhibit 2).  We noted that the deposits consisted of personal checks made payable to "USA Financial Management Services" from various clients.  From a sample of client files reviewed, when a client made a transfer of funds directly to USARMS (not through Entrust), the promissory note was executed from USARMS to the client. (see Exhibit 3).

*Unidentified Deposits*

Due to a lack of bank documentation for items noted as "Teller Deposits" on the bank statements, we noted unidentified deposits in the amount of $6.9 million.

*Other Sources*

Miscellaneous deposits totaling $175,000 consisted of a deposit in January 2009 for $50,000 from the State Bar of California, an "Item Charged Back" in March 2009 for $100,000, and a reimbursement from Mahmut "Francois" Durmaz in June 2009 for $25,000.

During our review and analysis of the USARMS Harris bank statements for the period June 1, 2008 through February 28, 2010, we did not identify any international incoming wire transfers or investment deposits related to Turkish Eurobonds or any other type of investment vehicle that could have been used to make interest or principal payments to USARMS' clients.

**Uses**

*Marlali*

We identified $4.7 million, or 23.5% of the total uses of funds, as transfers made to Marlali in the form of wire transfers, checks or debit memos.  We traced each disbursement to the corresponding deposit on the Marlali bank statements for the period in which we had bank statements for each entity (June 2008 through February 2010).  A detailed analysis of the use of these funds is described in the Marlali section of this report.

*Entrust*

The second largest use of funds, in the amount of $3.2 million, or 16.3% of the total uses of funds, consisted of disbursements made to Entrust IRA Services in the form of checks for the clients that made their contributions through their IRAs.  Based on the notes included on the face of the checks, the payments were primarily for interest. (see Exhibit 6 for an example of this disbursement)  Occasionally, the Entrust payments included principal payments.  Based on the documentation reviewed, it appears that USARMS made bulk transfers to Entrust for interest and principal payments, for the benefit of individual clients; however, there we could not identify a pattern for the payments.  One month might include three payments to Entrust and the next month 20 payments.

Attorney Work Product
Privileged and Confidential
Preliminary Draft

*Principal Payments – Direct Investors*

We identified $2.3 million, or 11.5% of the total uses of funds, of principal repayments on the promissory notes which were made directly by USARMS to its clients.  The largest principal repayments we identified were:

- Mehmet and Susan Orhan – multiple payments totaling $950,000 in December 2009.
- Dolores and Edward Krall - $591,000 in November 2009.
- Fatma B. Ogutcu - multiple payments totaling $408,980 between March 2009 and December 2009.

During our review of the bank statements, we also noted multiple checks made payable to USARMS's clients for interest payments on outstanding promissory notes.  These interest payment checks usually ranged between $1,000 and $3,500 each.

*Mahmut "Francois" Durmaz*

We identified $1.1 million, or 5.8% of the total uses of funds, in transfers and payments made to Mahmut "Francois" Durmaz.  These disbursements took the form of checks made payable to him and wire transfers to his personal bank account at Harris Bank.  Handwritten notes on the face of the checks included:  "loan", "bonus", "payroll" and "loan for divorce settlement".

*Other Uses*

We identified other uses of funds totaling $1.4 million, or 7.2% of the total uses of funds, which included the following:

- Check dated October 1, 2008 in the amount of $625,000 for an escrow payment to "Sequoia Avenue LLC" with a notation "Orhan, Jim Vogt, Marlene Vogt, Bob Vogt Transi".  Based on documentation reviewed, Sequoia Avenue LLC appears to be an entity that was created to purchase a building located at 375 Sequoia Avenue, Ontario, California with some of USARMS' clients (Orhan and Vogt Family)[4]. The documentation indicated that the deal was never consummated and that the approximate amount of the October 1, 2008 escrow payment ($621,600 was actually returned) was re-deposited in Marlali on October 9, 2008. We traced that deposit to Marlali's October 2008 bank statement. (see Exhibit 7)
- Checks paid to Robert Pribilski totaling at least $101,000. Notations such as "loan for Westmount Apart Deal", "loan repayment", and "loan repay #3 in full" were noted on the

---

[4] We noted that the mortgage broker for the transaction was listed as John Burns, a current employee of USARMS.

checks.   Additional checks of smaller denominations were also made to Mr. Pribilski during the June 2008 through February 2010 time frame; however, we limited our review to checks over $10,000 for purposes of this preliminary report.

- Checks totaling $107,000 were made payable to "Cash".
- Transfer dated February 3, 2010 for $75,000 to Bridge Forum LLC located at 2121 Avenue of the Stars, Ste 2970, Los Angeles, CA 90067 (same address as USARMS's Los Angeles office) with the note "Loan: Swissotel deposits". (see Exhibit 8)
- Check dated January 15, 2010 in the amount of $35,000 paid to John Pawley with the mention "loan" and check dated January 19, 2010 for $35,000 paid to Lori Pawley with the mention "loan against investments".
- Check dated December 4, 2009 for $27,561 paid to Audi Financial Service for the loan payoff of a 2007 Audi.  USARMS was noted as the original purchaser on the bill of sale, however, we found a "Car Bill of Sale" stating that this car was sold by Robert Pribilski/USARMS to Francois "Mahmut" Durmaz on January 20, 2010 for $2,000. (see Exhibit 9)

### Chase Account

We identified a total of $120,000 of checks made payable to USARMS for transfers to a Chase Bank account #651170342.  The total deposits in the Chase account from June 2008 through February 2010 totaled approximately $210,000.  Based on a preliminary review of the activity included in the Chase statements, the major categories of expenses paid related to airfares, hotels, restaurants, public storage, and ATM cash withdrawals.

### Giray Durmaz

We identified fund disbursements totaling $81,000 disbursed to Giray Irfan Durmaz through international wire transfers to Turkey and Bank of America account #381010122930. Based on an email we found, Giray I Durmaz was represented to be the Fund Manager for Cruzar PEF. (see Exhibit 10)

## 2.  Overview of Marlali – Sources and Uses

The table below summarizes our preliminary findings of sources and uses of Marlali funds for the time period January 2008 through February 2010, the period of Harris Bank statements found at the USARMS/Marlali Oak Brook Terrace location:

**Marlali - Harris Account #6582**
**January 1, 2008 through February 28, 2010**

**Sources of Funds: (see Exhibit C for details)**

| | | | |
|---|---|---:|---:|
| USARMS | $ | 7,665,431 | 91.2% |
| Other unidentified Sources of Funds | | 739,734 | 8.8% |
| | | 8,405,165 | 100.0% |

**Uses of Funds: (see Exhibit D for details)**

| | | |
|---|---:|---:|
| Restaurants | 2,156,471 | 25.8% |
| Real estate | 1,138,393 | 13.6% |
| International wire transfers | 1,065,000 | 12.7% |
| Other Marlali bank accounts | 467,609 | 5.6% |
| Miscellaneous | 1,194,546 | 14.3% |
| Other unidentified wire transfers | 1,677,371 | 20.0% |
| Unidentified debit memos | 674,265 | 8.1% |
| | 8,373,656 | 100.0% |

| | | |
|---|---|---:|
| **Souces less uses** | $ | 31,509 |

In the above table, we summarized the total sources of funds (i.e. transfers from USARMS and other) and total uses of funds (i.e. restaurants, real estate, international wire transfers, transfers to other Marlali bank accounts, other).   The total sources and uses are approximately $8.4 million during the period January 2008 through February 2010. (see Exhibits C and D for additional detail)  At the end of February 2010, the Marlali Harris Bank account had a balance of $31,727.

## Sources

We identified $7.7 million or 91.2% of the $8.4 million sources of funds at Marlali were transfers from USARMS.  Of the $7.7 million transferred from USARMS to Marlali, we were able to trace $6.4 million to promissory notes written from Marlali (maker) to USA Retirement (holder).  See Exhibit 11 for an example of the promissory notes totaling $6.4 million.  In addition, another $621,600 was a return of an escrow deposit, originally funded by USARMS, for the purchase of the Sequoia Ave. property that wasn't consummated (see USARMS narrative for additional discussion of this transaction). There was also another $700,000 that were able to identify as USARMS transfers by reviewing the USARMS' Harris bank statements.

The remaining $739,734 of Marlali sources were noted as either "Teller Deposits" or "Credit Memos" on the bank statements; however, we were not able to locate additional bank support for these deposits and credit memos to identify the source of these funds.

Attorney Work Product
Privileged and Confidential
Preliminary Draft

We were able to trace 100% of the USARMS source of funds from Marlali's Harris account statements to the USARMS' Harris account statements for the period June 1, 2008 through February 28, 2010.

## Uses

### Restaurants

The largest use of Marlali funds, in the amount of $2.2 million, for the period January 1, 2008 through February 28, 2010, was for investments in restaurants.  While we are not able to identify the exact number of restaurants that Marlali was operating, the number of restaurants could be as high as 16 locations in California and Washington based on documentation we found. (see Exhibit 12).   We noted a wire transfer in the amount of $969,788 to Gulen Enterprises ("Gulen") on May 12, 2008.  From documentation reviewed, it appears that this use of funds is for a purchase of three restaurants under the Sultan's Fresh Mediterranean and Anthony's NY Deli concept which were owned by Gulen.[5]

Other significant uses of funds for restaurants included $453,983 for rent for the various restaurant locations, $430,078 for restaurant build-out, point of sales computer systems, and restaurant supplies, and $302,622 for architect fees (see Exhibit 13).

### Real Estate

Marlali funds were also used for real estate projects in the amount of at least $1.1 million.  The largest payments we identified were a $404,884 payoff of a loan with Old Second National Bank for an apartment property in Cicero, Illinois, $285,075 for USARMS' California office rents, $184,100 for California property taxes, $100,000 for a deposit on a Sequoia property purchase, $76,721 principal payment for a Naperville condo and $50,000 for deposits on a property in Westmont, Illinois.

### International Wire Transfers

We identified at least $1.1 million of international wire disbursements from Marlali's Harris account during the period January 1, 2008 through February 28, 2010.  Two 2008 wire transfer requests totaling $200,000 from Marlali to Mehmet Karakus in Turkey were found and we were

---

[5] Letter dated June 29, 2009 from Robert Pribilski to the California Office of Finance states that Marlali owned "three restaurants: one in Century City and two in Topanga.  A local law firm did the original filings as we bought the restaurants mid-2008 out of bankruptcy court."

Attorney Work Product
Privileged and Confidential
Preliminary Draft

able to agree the amounts to the Harris bank statements. (see Exhibit 14).   Additionally, we found wire transfer requests from both Marlali and USARMS to Turkey totaling $1.5 million in 2005 and 2006. (see attached Exhibit 15).

*Other Marlali Bank Accounts*

Transfers of at least $467,609 were made from Marlali's Harris bank account to a Marlali Bank of America "Disbursement" account #6514. (see Exhibit F for this bank account number).   We were not able to locate bank statements for this Bank of America account at USARMS' locations.   See Exhibit 16 for a sample of a wire transfer request to the Marlali Bank of America disbursement account.

*Other Miscellaneous*

We identified approximately $1.2 million in other miscellaneous uses of Marlali funds. Significant individual payments included $210,000 to an immigration law firm on March 27, 2008 and April 25, 2008[6] (see attached Exhibit 17) and $85,000 in transfers to USARMS.   Other smaller individual payments noted on the check copies attached to the bank statements were for expenses of the Cicero and Aurora rental properties and other payments, including mortgage payments, property taxes, repairs, association dues and attorney fees.[7]

*Other Unidentifiable Uses*

Other Marlali uses of funds include $1.7 million for other wire transfers and $674,265 for debit memos. We were not able to locate bank documentation to identify the nature of these other uses of Marlali funds.

During our review and analysis of the Marlali Harris bank statements for the period June 1, 2008 through February 28, 2010, we did not identify any international incoming wire transfers or investment deposits related to Turkish Eurobonds or any other type of investment vehicle that could have been used to make interest or principal payments to USARMS' clients.

---

[6] We also noted six payments to the US Citizenship & Immigration Services that cleared the Marlali bank account in April 2008 (see Exhibit 17).

[7] For purposes of this preliminary report, individual checks under $10,000 were not reviewed and categorized.

Attorney Work Product
Privileged and Confidential
Preliminary Draft

### 3.  Other Preliminary Observations

*Orhan Lawsuit*

During our document review in Robert Pribilski's office, we found a large folder labeled Mr. and Mrs. Orhan.  Among the contents of the file were:

- March 20, 2009 complaint against Robert Pribilski, Francois Durmaz, USARMS and Marlali in Cook County, Illinois Circuit Court.  The complaint alleges fraudulent inducement in the Cicero and Aurora real estate transactions, breach of fiduciary duty and demands an accounting of all the Orhan's amounts invested with USARMS including IRA funds.  The suit demands information regarding $365,000 in Eurobond investments that defendants maintain was the investment vehicle for a portion of the Orhan's funds.
- March 2, 2009 correspondence from Orhan's attorney to Mr. Pribilski regarding a meeting that took place on February 24, 2009 between the Orhan's, their attorney, Mr. Pribilski, Mr. Durmaz and their attorney Roger Carlson.  The correspondence mentions the request for documentation of the Eurobonds, which Mr. Durmaz was to provide.
- Handwritten notes listing "Concern:" including "David Hernandez – Ponzi", "SEC – not fun", "Stress > hurting my Business", and "Media attention – SEC, FBI, etc."
- June 10, 2009 Mehmet Orhan affidavit in the Cook County lawsuit.
- An order entered by Judge Richard J. Billik on January 19, 2010 dismissing the case after being advised that defendants made the agreed-to $950,000 payment to the Orhan's. (see attached Exhibit 18).

As discussed in the USARMS section above, four payments totaling $950,000 were made from USARMS to the Orhan's during the period December 15 – 22, 2009.

*Cruzar Funds*

Based on documentation found at the Oak Brook Terrace office, the USARMS/Marlali principals appear to have been in the process of starting a new investment vehicle, Cruzar Funds. Excerpts, including the agenda and organizational charts, from a training and conference manual for a meeting that presumably took place on December 7-9, 2009 in Los Angeles, California are attached as Exhibit 19.

*Marlali Turkey*

Attorney Work Product
Privileged and Confidential
Preliminary Draft

We found an organizational chart listing four Turkish entities as subsidiaries of Marlali and the Board of Directors of these entities. (see Exhibit 20)  Among the Board of Directors listed are Sibel Ince (Francois' wife or girlfriend) and Umit Pecen, who is listed as Marlali's CFO.   In addition, we have found architectural drawings of a development named Project Adonis, which appears to be the major real estate development project of these Turkish entities. (see Exhibit 21).

<u>Listing of Possible Assets/Additional Bank Accounts</u>
Based on our document review, we have compiled a list of potential assets that may be owned by USARMS, Marlali, Mr. Pribilski and/or Mr. Durmaz and additional bank accounts identified during our document review. (see Exhibits E and F).

<u>Other Financial Difficulties</u>
During our document review, we noted several instances where there was evidence of the financial difficulties of the principals, individually and on a company-wide basis.  We found a large file in Robert Pribilski's office which detailed credit difficulties he was having during 2004 and 2005.   Included in the file were multiple letters detailing settlement of debts, attorney correspondence re: the same, copies of credit reports and an unsigned Chapter 7 Bankruptcy filing.

We also noted during the first quarter of 2009 that multiple items were being charged back by Harris Bank for insufficient funds in USARMS' bank account.  Multiple documents were found including notices of default, late payments, and court complaints indicating that Marlali was in arrears (multiple months) on rent payments for their restaurants located in California. Further, we noted that Roseville Shoppingtown LLC (aka Westfield Galleria at Roseville) shutdown one of Marlali's New York Deli restaurants on July 31, 2009 for non-payment of rent and filed a lawsuit against Mr. Pribilski and Mr. Durmaz for unpaid rent under the lease agreement.  Finally, there we found additional handwritten notes dated August 6, 2009 which include notations such as "Marlali Bankruptcy" and "Double Ch. 11". (see Exhibit 22).

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                             )      ss:
COUNTY OF LOS ANGELES        )

   I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen (18) years and not a party to the within action.  My business address is 9401 Wilshire Boulevard, Beverly Hills, California 90212-2974.

   On March 22, 2010, I served the document described as

   FIRST INTERIM REPORT OF STEPHEN J. DONELL, TEMPORARY RECEIVER

on counsel for the parties in this action, or on the parties in propria persona, addressed as stated on the attached service list:

[X]     BY MAIL:  By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service.  I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service.  In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service on that same day.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

[ ]     BY NEXT-DAY DELIVERY:  Via Overnite Express.  I am readily familiar with my employer's practice for the collection and processing of correspondence via Overnite Express.  In the ordinary course of business, this correspondence would be picked up by Overnite Express on that same day.

[X]     BY ELECTRONIC TRANSMITTAL:  I caused such document to be sent via email to the following e-mail addresses:

        vanhavermaatd@sec.gov
        mhathaway@weksmanlaw.com
        steve.donell@jalmar.com

[ ]     BY FACSIMILE:  I caused such document to be sent via facsimile to the names and facsimile numbers listed above and received confirmed transmission reports indicating that this document was successfully transmitted to the parties named above.

[ ]     (STATE) I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

[X]     (FEDERAL) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

EXECUTED on March 22, 2010 at Beverly Hills, California.

J. Michael Johnston

ERVIN COHEN & JESSUP LLP

1

## SERVICE LIST

2

3   David J. Van Havermaat
    Securities and Exchange Commission
    5670 Wilshire Boulevard, 11th Floor
4   Los Angeles, CA  90036

5   Mark McClellan Hathaway
    Mark J. Werksman Law Offices
6   888 West Sixth Street, 4th floor
    Los Angeles, CA 90017

7

8   Steve J. Donell
    Jalmar Properties, Inc.
    12121 Wilshire Blvd., Suite 301
9   Los Angeles, CA  90025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28